

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-21-00150-CV

———————————————

WENDY MINCER, Appellant

V.

BRIAN MARK SUMMERS, Appellee

On Appeal from the 442nd District Court
Denton County, Texas
Trial Court No. 19-10500-442

Before Sudderth, C.J.; Kerr and Bassel, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

Appellant Wendy Mincer, appearing pro se, appeals from a final decree of divorce that dissolved her marriage to Appellee Brian Mark Summers. In her initial issue, Wendy challenges the trial court's failure to admonish her of her right to appointed counsel at an enforcement hearing. In her remaining four issues, Wendy argues that the trial court abused its discretion as to various property awards that it made in the final decree and that the final decree thus does not contain a just-and-right division of the community property. Because we hold that the trial court's error in failing to admonish Wendy at the enforcement hearing was not harmful due to Brian's withdrawing his request for contempt and because we hold that sufficient evidence supports the challenged property awards and that the trial court did not abuse its discretion by making the challenged awards, we affirm the final decree of divorce.

## II. Factual and Procedural Background

Wendy filed for divorce on November 5, 2019, and attached the "Denton County Standing Order Regarding Children, Property[,] and Conduct of the Parties." The standing order included provisions related to how the parties could handle property during the suit:

> 3. **<u>PRESERVATION OF PROPERTY AND USE OF FUNDS DURING DIVORCE CASE.</u>** If this is a divorce case, both parties to the marriage are ORDERED to refrain from the following conduct:

2

3.1 Destroying, removing, concealing, encumbering, transferring, or otherwise harming or reducing the value of the property of one or both of the parties, regardless of whether it is intellectual, personal, or real property and regardless of whether it is claimed as separate or community property.

3.2 Misrepresenting or refusing to disclose to the other party or to the [c]ourt, on proper request, the existence, amount, or location of any property, including electronically stored or recorded information, of one or both the parties, regardless of whether it is intellectual, personal, or real property and regardless of whether it is claimed as separate or community property.

3.3 Damaging, destroying[,] or tampering with the tangible or intellectual property of one or both of the parties, including any document or electronically stored or recorded information that represents or embodies anything of value, regardless of whether it is intellectual, personal, or real property and regardless of whether it is claimed as separate or community property.

3.4 Selling, transferring, assigning, mortgaging, encumbering, or in any other manner alienating any of the property of either party, regardless of whether it is intellectual, personal, or real property and regardless of whether it is claimed as separate or community property, except as specifically authorized by this order or a subsequent order of this [c]ourt.

3.5 Incurring any indebtedness, including cash advances from a credit card or line of credit, other than legal expense in connection with this suit, except as specifically authorized by this order or a subsequent order of this [c]ourt.

3.6 Making withdrawals from any account in any financial institution for any purpose, except as specifically authorized by this order or a subsequent order of this [c]ourt.

3.7 Spending any sum of cash in either party's possession or subject to either party's control for any purpose, except as specifically authorized by this order or a subsequent order of this [c]ourt.

. . . .

3

6. **SPECIFIC AUTHORIZATIONS IN DIVORCE CASE.** If this is a divorce case, both parties to the marriage are specifically authorized to do the following:

6.1 To engage in acts reasonabl[e] and necessary to the conduct of that party's usual business and occupation.

6.2 To make expenditures and incur indebtedness for reasonable attorney's fees and expenses in connection with this suit.

6.3 To make expenditures and incur indebtedness for reasonable and necessary living expenses commensurate with such expenditures and indebtedness incurred for the past six months.

6.4 To make withdrawals from accounts in financial institutions only for the purposes authorized by this order.

Shortly after Wendy filed for divorce, the parties agreed to dismiss the case, and Wendy nonsuited the case. On November 22, 2019, Wendy withdrew $56,631.50 from the parties' joint checking account.

Not many days after she made the withdrawal, Wendy filed a motion to reinstate, and on December 9, 2019, the trial court granted Wendy's motion to reinstate the case. Eleven days after the case was reinstated, Wendy withdrew $28,548.43 from the parties' joint checking account.

Brian answered and later filed a counterpetition and first amended counterpetition in which he asserted a waste claim[1] against Wendy and sought to have

---

[1]In the portion of his counterpetition under the heading "Waste of Assets," Brian pleaded the following:

4

the trial court determine that Wendy had committed actual or constructive fraud and reconstitute the community estate in accordance with Family Code Section 7.009.

Brian also filed a "Motion for Enforcement of the Denton County Standing Order and for Contempt and Sanctions." Brian alleged that Wendy had violated Sections 3.1, 3.4, 3.6, and 3.7 of the Denton County Standing Order "by removing, withdrawing, transferring, alienating, and/or spending" $28,548.43 from the parties' joint checking account. Brian requested that Wendy be held in contempt, jailed for up to 180 days, and fined up to $500; that she be ordered to deposit $28,548.43 into the parties' joint account; and that she be ordered to pay Brian's attorney's fees. Wendy filed a response admitting that she had made the withdrawal[2] and arguing that the withdrawal was "for reasonable and necessary living expenses, business expenses and/or legal fees, as authorized by the Denton County, Texas[,] Standing Order."

The trial court held a Zoom hearing on Brian's motion for enforcement at which Wendy represented herself pro se. During the hearing, Brian's attorney called

[Wendy] has squandered community assets by spending community assets on prepayment of her living expenses, out of the ordinary course of her ordinary business.

[Wendy] has spent and wasted community funds as outlined above at a time when [she] knew or should have known that [Brian] would have objected to these expenditures. These expenditures and gifts of property are in direct violation of [Wendy's] duty as co-manager of the community estate.

[2]Wendy's response also admitted that she had withdrawn $56,631.50 on November 22, 2019, which was during the time that the case was nonsuited.

Brian to testify and then called Wendy. After Wendy was sworn in, the trial court had

the following discourse with Brian's attorney and Wendy:

> THE COURT: Okay. And the question I have for you, [Brian's attorney], is I believe in your pleadings you were requesting that she be placed in jail.
>
> Are you still requesting that today, or are you waiving that and just wanting the requested relief as presented?
>
> [BRIAN'S ATTORNEY]: We are . . . seeking contempt, Your Honor.
>
> THE COURT: Okay. So you're seeking jail time today?
>
> [BRIAN'S ATTORNEY]: Correct.
>
> THE COURT: All right. Ma'am, you understand . . . that they are requesting that you be placed in jail?
>
> [WENDY]: Um, do I . . . understand that?
>
> THE COURT: Yeah. Do you understand in their pleadings that they filed in January of last year, of this year, that they are requesting, because they said that you violated the [c]ourt's [s]tanding [o]rder, that they are asking that I place you in jail today because you violated -- they're alleging that you violated the [c]ourt's [o]rder? Do you understand that?
>
> [WENDY]: Yes.
>
> THE COURT: You understand that you should have an attorney represent you . . . because you're being held to the same standard as . . . any other attorney that would walk in this courtroom.
>
> And I apologize, [Brian's attorney]. I didn't realize -- I thought when I read your requested relief, that you weren't asking [for] jail time.

[BRIAN'S ATTORNEY]: And . . . that's my oversight. As it pertains to the contempt request, it's not specifically in the summary. But we are seeking contempt and we do --

THE COURT: Okay. Because I would have given her these admonishments at the beginning of the trial.

[BRIAN'S ATTORNEY]: And that's my oversight[;] . . . I apologize to the [c]ourt.

THE COURT: All right. Ma'am, . . . we've had a continuance for you to hire an attorney on one occasion, at least one occasion, and you have yet to find somebody to represent you; is that correct?

[WENDY]: Yes.

THE COURT: Okay.

[WENDY]: I do not . . . have the funds, Your Honor. And I've had two attorneys accept and then, um, withdraw since former counsel. . . .

. . . .

THE COURT: The problem is if you're communicating to me that you don't have the funds, then I need for you to go through and fill out an affidavit of indigency and tell me if you're indigent.

And then I have to have an indigency hearing to determine if you're indigent, because if they're requesting you be placed in jail, you have a right to have an attorney appointed to you, okay?

The trial court then stated that it would pause the proceedings and email Wendy an indigency form to complete, and Brian's attorney asked permission to conference with his client. After the conference, Brian withdrew his request for contempt. The trial court stated, "[Wendy], they are not asking that you be placed in jail, so there's no contempt issue as far as that." The trial court further explained,

7

> In a regular divorce case, you're not entitled to a court-appointed attorney. But if somebody is seeking to take away your liberty and place you in jail, then we make a determination to determine if you're indigent.
>
> They have waived any request for you to be placed in jail, so you are not entitled to a court-appointed attorney, okay?

Wendy then asked, "Can I . . . ask that they not waive it?" The trial court told Wendy that "really this isn't your choice. . . . It is their choice . . . ."

The trial court then allowed Brian's attorney to question Wendy. Wendy admitted that she had withdrawn $28,548.43 from the parties' joint checking account on December 20, 2019, and had used the money to prepay various expenses.

After hearing testimony from both parties and reviewing the evidence, the trial court found that Wendy had violated Sections 3.1, 3.4, 3.6, and 3.7 of the standing order by removing, transferring, withdrawing, and spending $28,548.43 from the parties' joint checking account "for a purpose not authorized by the Denton County Standing Order." The trial court ordered Wendy to deposit $28,548.43 in the court's registry and to pay $3,660.50 in attorney's fees and a $500 fine.

While the enforcement issue was pending, both parties filed motions for partial summary judgment. Brian's motion for partial summary judgment requested the trial court to find that the following items were his separate property: (1) real property on Wild Valley Drive and the proceeds from its sale and (2) a 0.591686% interest in CA 3000 Skyline, LLC. The trial court granted Brian's motion and confirmed both items as his separate property. Wendy's motion for partial summary judgment requested the

8

trial court to find that Brian had committed adultery, sought to have $100,000 be deemed a gift to her, and requested the trial court to find that Brian had wasted community assets by buying an engagement ring for his fiancée. The trial court granted Wendy's motion for partial summary judgment on the adultery ground but denied the motion as to all other issues.

The case ultimately proceeded to a two-day bench trial at which both Brian and Wendy were represented by counsel. The final decree of divorce granted divorce on the ground of adultery and divided the marital estate. With regard to the property division, the only awards challenged on appeal are the trial court's award of two North Carolina properties to Brian and the following amounts awarded to Wendy as illusory assets:[3]

> W-7. The Court FINDS that the following payments ordered by [Wendy] to pay to [Brian] are still outstanding, due[,] and owing and that said amounts are awarded to [Wendy]:
>
> a. $500.00 fine [Wendy] was ordered to pay to [Brian] on or before October 9, 2020, pursuant to the Order on Motion for Enforcement of Denton County Standing Orders dated October 7, 2020.
>
> b. Payment of $28,548.43 by [Wendy] into the Registry of the Court on or before October 14, 2020, pursuant to the

---

[3] *See Orzechowski v. Orzechoska*, No. 14-20-00055-CV, 2021 WL 3202679, at *2 (Tex. App.—Houston [14th Dist.] July 29, 2021, no pet.) (mem. op.) (stating that the trial court, after finding that husband had committed a fraud on the community by depleting the community estate of nearly $572,000, reconstituted the community estate with the amount of husband's fraud and then awarded that entire amount to husband "as an illusory asset").

Order on Motion for Enforcement of Denton County Standing Orders dated October 7, 2020.

c. Payment of $3,660.50 by [Wendy] to [Brian] for [Brian's] reasonable and necessary attorney's fees on or before October 29, 2020, pursuant to the Order on Motion for Enforcement of Denton County Standing Orders dated October 7, 2020.

d. Payment of $826.00 by [Wendy] to [Brian] for [Brian's] reasonable and necessary attorney's fees on or before October 29, 2020, pursuant to the Order Granting Respondent's Motion for Protective Order dated October 7, 2020.

W-8. The Court FINDS that in order to obtain a fair and equitable division of the reconstituted estate of the parties as a result of [Wendy]'s fraud against the community estate in wasting and depleting the value of the community assets in the amount of $56,631.50 is awarded to [Wendy].

Wendy requested findings of fact and conclusions of law. The trial court complied after Wendy filed a notice of past-due findings of fact and conclusions of law.

Wendy filed a late motion for new trial and a motion to allow the late-filed motion for new trial to be treated as timely filed pursuant to Rule 21(f)(6). *See* Tex. R. Civ. P. 21(f)(6). The trial court granted her motion to allow the late-filed motion for new trial to be treated as timely filed[4] but ultimately denied Wendy's motion for new trial. Wendy then perfected this appeal.

---

[4]The time for filing a motion for new trial is dictated by Texas Rule of Civil Procedure 329b(a), which provides that "[a] motion for new trial, if filed, shall be filed prior to or within thirty days after the judgment or other order complained of is

10

### III. The Enforcement Hearing and Order

#### A. Brian's Jurisdictional Challenge

Before we can take up Wendy's first issue challenging the lack of a right-to-counsel admonishment at the enforcement hearing, we must address Brian's argument that Wendy failed to properly perfect an appeal related to the order on the motion for enforcement. Brian argues that Wendy filed her notice of appeal on May 12, 2021,

signed." Tex. R. Civ. P. 329b(a). We also note that Rule 5 of the Texas Rules of Civil Procedure prevents the enlargement of the time to file such a motion by stating that "[t]he court may not enlarge the period for taking any action under the rules relating to new trials except as stated in these rules." Tex. R. Civ. P. 5. But the rules also provide that "[a]n electronically filed document is deemed filed when transmitted to the filing party's electronic filing service provider." *See* Tex. R. Civ. P. 21(f)(5); *see also Nevarez Law Firm, P.C. v. Investor Land Servs., L.L.C.*, 610 S.W.3d 567, 568–69 (Tex. App.—El Paso 2020, no pet.) (op. on reh'g) (holding that motion for new trial, which was transmitted to e-filing system but was rejected by clerk for insufficient fee and was routed to wrong clerk, was considered timely filed when deficiencies were corrected); *In re Barr*, No. 05-19-00511-CV, 2019 WL 2082468, at *1 (Tex. App.—Dallas May 13, 2019, orig. proceeding) (mem. op.) (holding that noncompliant motion for new trial returned by clerk for correction was timely because it "was timely-filed within the trial court's plenary period when it was first transmitted to [movant's] electronic[-]filing service provider on" the date that it was due). Thus, the filing date that applies to Wendy's motion is the date that it was transmitted to the e-filing system. Further, the rules mandate that a filing party "must be given a reasonable extension of time to complete the filing" if a document is untimely because of "a technical failure or a system outage." *See* Tex. R. Civ. P. 21(f)(6). We read the provisions of this rule to carry forward the principle in Rule 21(f)(5) that a filing has occurred when the document is transmitted to the electronic-filing service provider because the rule references a process that is being completed. *See Jimenez v. Lewis*, No. 14-17-00347-CV, 2019 WL 546426, at *3 (Tex. App.—Houston [14th Dist.] Feb. 12, 2019, no pet.) (mem. op.) (holding that "[b]ecause the trial court granted [movant's] motion for leave based on Rule 21(f)(6), [movant's] motion for new trial is deemed timely filed on" date it was originally due). Thus, in this case, the granting of Wendy's motion confirmed that her filing was timely and did not transgress Rule 5's strictures that "[t]he court may not enlarge the period for taking any action under the rules relating to new trials." *See* Tex. R. Civ. P. 5.

and stated that her appeal was "taken from the order dated February 1, 2021[,] as a final decree of divorce." Brian thus contends that Wendy failed to appeal the enforcement order because her notice of appeal did not mention the October 7, 2020 enforcement order and because she did not appeal from the enforcement order within the time period specified by Texas Rule of Appellate Procedure 26.1. Brian's arguments, however, fail to acknowledge that the amounts assessed in the enforcement order were carried forward into the final decree, as demonstrated by the provisions from the final decree that are set forth above. Brian raises no jurisdictional challenge to the timeliness of Wendy's appeal of the final decree. Because the final decree contains the challenged assessments from the enforcement hearing and because Wendy timely perfected an appeal from the final decree, we hold that we have jurisdiction to review the complained-of assessments from the enforcement hearing.[5]

## B. Wendy's Challenge to the Failure to Admonish Her

In her first issue, Wendy argues that at the enforcement hearing, the trial court

---

[5]Moreover, the enforcement order was a temporary order from which no appeal could lie. *See Pettus v. Pettus*, 237 S.W.3d 405, 416 (Tex. App.—Fort Worth 2007, pet. denied) ("Typically, temporary orders expire with the entry of a final judgment and cannot function as a final disposition on an issue."); *Word v. Word*, 46 S.W.2d 749, 750 (Tex. App.—San Antonio 1932, writ ref'd) ("A decretal order although interlocutory in its nature may, of course, be carried forward and embodied in a final decree and thus become an essential part of that decree, but until it is so embodied in the final decree no appeal will lie."); *cf. Hendren v. Lazar*, 641 S.W.3d 814, 819–20 (Tex. App.—El Paso 2022, no pet.) (holding that jurisdiction was lacking over an interlocutory appeal from a trial court's temporary injunction in a divorce suit that barred one party from selling or disposing of community property).

erred by failing to first determine if it was possible that Wendy might be incarcerated and to admonish [her], prior to Brian['s] proceeding to offer evidence on his [e]nforcement [m]otion that sought to have her sentenced to jail, that she might have a right to appointed counsel and to warn of the danger of proceeding pro se.

In a similar context, we have previously held that due-process challenges to a status hearing and the order entered thereafter were mooted by the entry of a final order of termination. *See In re K.E.*, No. 02-20-00045-CV, 2020 WL 4360493, at *3 (Tex. App.—Fort Worth July 30, 2020, pet. denied) (mem. op.); *see also In re C.R.J.*, No. 06-13-00053-CV, 2014 WL 199209, at *2 (Tex. App.—Texarkana Jan. 17, 2014, no pet.) (mem. op.) (holding that appellant's complaints about a trial court's holding of a temporary hearing or issuing temporary orders were rendered moot by the entry of a final modification order). We conclude that the same logic applies here to Wendy's due-process challenges regarding the lack of certain admonishments at the enforcement hearing, and we hold that her argument is therefore moot.

Alternatively, even if we consider Wendy's issue on the merits, she would not prevail. Due to the unique facts, showing that Brian waived his request for contempt during the enforcement hearing, we conclude that the trial court's error in initially failing to comply with Section 157.163(a) did not harm Wendy.

Texas Family Code Section 157.163 governs the appointment of an attorney for an enforcement hearing:

> (a) In a motion for enforcement or motion to revoke community service, the court must first determine whether incarceration of the respondent is a possible result of the proceedings.

13

(b) If the court determines that incarceration is a possible result of the proceedings, the court shall inform a respondent not represented by an attorney of the right to be represented by an attorney and, if the respondent is indigent, of the right to the appointment of an attorney.

(c) If the court determines that the respondent will not be incarcerated as a result of the proceedings, the court may require a respondent who is indigent to proceed without an attorney.

(d) If the respondent claims indigency and requests the appointment of an attorney, the court shall require the respondent to file an affidavit of indigency. The court may hear evidence to determine the issue of indigency.

(d–1) The court may conduct a hearing on the issue of indigency through the use of teleconferencing, videoconferencing, or other remote electronic means if the court determines that conducting the hearing in that manner will facilitate the hearing.

(e) Except as provided by Subsection (c), the court shall appoint an attorney to represent the respondent if the court determines that the respondent is indigent.

. . . .

(i) The scope of the court appointment of an attorney to represent the respondent is limited to the allegation of contempt or of violation of community supervision contained in the motion for enforcement or motion to revoke community supervision.

Tex. Fam. Code Ann. § 157.163(a)–(e), (i). If incarceration is a possible result of the enforcement proceedings and the trial court fails to admonish an alleged contemnor of her right to counsel in accordance with Section 157.163, the contempt and commitment orders are rendered void. *See In re Rivas-Luna*, 528 S.W.3d 167, 170 (Tex. App.—El Paso 2017, orig. proceeding) (first citing *Ex parte Acker*, 949 S.W.2d 314, 316 (Tex. 1997) (orig. proceeding); then citing *Ex parte Keene*, 909 S.W.2d 507, 507–08

14

(Tex. 1995) (orig. proceeding); and then citing *Ex parte Gunther*, 758 S.W.2d 226, 227 (Tex. 1988) (orig. proceeding)).

Here, as detailed in the factual and procedural background above, the trial court did not make a determination at the outset of the hearing regarding whether incarceration would be a possible result of the enforcement hearing because, as the trial court acknowledged, it had not recognized until midway through the hearing that Brian's motion for enforcement included such a request. The trial court thus failed to comply with Section 157.163(a) and (b). *See* Tex. Fam. Code Ann. § 157.163(a), (b).

However, once the trial court recognized that Brian's motion had requested contempt and confirmed that fact with his attorney, the record reflects that the trial court took steps to remedy the error, including informing Wendy that she "should have an attorney" and stating that the court would email an indigency form to Wendy and pause the proceedings while she completed and returned the form. *See id.* § 157.163(b). At the same time, Brian's attorney requested to conference with Brian; after which, Brian withdrew his request for contempt. The trial court, concluding that there was no longer any "contempt issue," allowed Brian's attorney to question Wendy and allowed her to continue representing herself pro se. *See id.* § 157.163(c). When the hearing concluded, the trial court did not enter a contempt order or a commitment order. Accordingly, there is no contempt order or commitment order that was rendered void by the trial court's initial failure to comply with Section 157.163(a) and (b).

15

Wendy contends that Brian's "announcement"—that he was withdrawing his contempt request—came too late to be an effective abandonment. Wendy cites the rule of civil procedure for abandoning claims and also cites cases to support her statement that "[g]enerally, a statement that constitutes abandonment of a claim is made prior to or at the start of the proceeding to adjudicate the claims." *See* Tex. R. Civ. P. 165; *In re Shaw*, 966 S.W.2d 174, 177 (Tex. App.—El Paso 1998, no pet.) (op. on reh'g). She does not, however, explain why Brian's abandonment of his request for contempt during the enforcement hearing was not timely other than her reference to evidence that was admitted prior to Brian's withdrawing his request for contempt; she points out that eleven exhibits and 800 lines of transcript, which included Brian's testimony, were admitted while she did not have counsel.

> The applicable law states that
>
> "[a] party who abandons any part of his claim or defense, as contained in the pleadings, may have that fact entered of record, so as to show that the matters therein were not tried." Tex. R. Civ. P. 165. Whether a pleading has been abandoned is a question of law [that] we review de novo. *Sosa v. Central Power & Light Co.*, 901 S.W.2d 562, 567 (Tex. App.—San Antonio . . . ), *rev'd on other grounds*, 909 S.W.2d 893 (Tex. 1995). Formal amendment of the pleadings is not required in order to show abandonment. *Id.* Indeed, a stipulation may form the basis for abandonment. *Id.*

*Shaw*, 966 S.W.2d at 177.

The record demonstrates that Brian stipulated at the enforcement hearing that he was withdrawing his request for contempt, and the trial court recognized Brian's stipulation and proceeded as if incarceration were no longer a possible outcome of the

enforcement hearing. Thus, the evidence that was admitted before Brian withdrew his request for contempt could not be used to hold Wendy in contempt when there was no longer a request for contempt on the table. Accordingly, we cannot conclude that the timing of Brian's abandonment of his contempt request runs afoul of Rule 165 or somehow harmed Wendy. *See generally* Tex. R. Civ. P. 165; *Pajooh v. Miller*, No. 01-16-00927-CV, 2018 WL 3233466, at *1 n.3 (Tex. App.—Houston [1st Dist.] July 3, 2018, no pet.) (mem. op. on reh'g) ("[Appellant] also asserted other causes of action against appellees, but he withdrew those claims *during* the summary[-]judgment hearing." (emphasis added)); *Kaye/Bassman Int'l Corp. v. Help Desk Now, Inc.*, 321 S.W.3d 806, 811 n.5 (Tex. App.—Dallas 2010, pet. denied) (stating that "*during* a telephonic hearing" that occurred after the hearing on the motions for summary judgment and before the final judgment was signed by the trial court, appellee "agreed to 'abandon' its claim for attorneys' fees under the [D]eclaratory [J]udgments [A]ct so that the trial court's judgment 'could be final'" (emphasis added)).

Additionally, Wendy argues that she did not agree to Brian's abandonment and specifically asked that his request for contempt not be waived. Wendy did make such a request during the enforcement hearing, but the trial court correctly informed her that abandoning the claim was Brian's choice, not hers, to make. Because the request for contempt was included in Brian's motion to enforce, he had the sole discretion to abandon that claim.

17

Moreover, to the extent that Wendy argues that if she had been appointed counsel, then the evidence that came in during Brian's testimony could have been kept out, Wendy fails to recognize that the same evidence came in during her testimony—when she did not have a right to an attorney because incarceration was off the table. During her testimony, she admitted that she had withdrawn the funds that were the subject of the enforcement hearing and that she had used them to prepay various expenses.

Because the record clearly shows that Brian withdrew his request for contempt and because no contempt or commitment orders were entered against Wendy as a result of the enforcement hearing, she has failed to show how she was harmed by the trial court's error in failing to comply with Section 157.163(a) and (b) at the outset of the hearing. And because Section 157.163 provides for the right to counsel only if incarceration is a possible outcome of the enforcement hearing and the possibility of incarceration was removed, we decline Wendy's invitation to hold that the enforcement order must be overturned. Accordingly, we overrule Wendy's first issue.

## IV. The Final Decree

In her second through fifth issues, Wendy challenges various awards contained in the final decree. We address each of these issues below and, after analyzing each, hold that Wendy has not shown that the trial court abused its discretion when it made the challenged awards in dividing the marital estate.

18

### A.     Standards of Review

We have previously set forth the standard of review when analyzing a trial court's property division:

> In dividing a marital estate, the trial court is to do so in a manner that it deems "just and right, having due regard for the rights of each party." Tex. Fam. Code Ann. § 7.001.  We review the trial court's property division for an abuse of discretion[] and presume that it exercised its discretion properly.  *See Murff v. Murff*, 615 S.W.2d 696, 698–99 (Tex. 1981).  A trial court abuses its discretion if the division is manifestly unfair.  *Mann v. Mann*, 607 S.W.2d 243, 245 (Tex. 1980).
>
> Although the trial court is not required to divide the marital estate equally, its division must be equitable and supported by a reasonable basis in the record.  *See Halleman v. Halleman*, 379 S.W.3d 443, 452 (Tex. App.—Fort Worth 2012, no pet.); *O'Carolan v. Hopper*, 71 S.W.3d 529, 532 (Tex. App.—Austin 2002, no pet.).  *See generally Cameron v. Cameron*, 641 S.W.2d 210, 223 (Tex. 1982) ("[W]e continue the national trend endorsing the use of marital property as the means of settling the equities between divorcing spouses.").  To the extent [appellant] argues that the evidence does not support the trial court's property division, we are still guided by the abuse-of-discretion standard but consider the evidentiary support (or lack thereof) as a factor relevant to our assessment of the trial court's exercise of discretion.  *See Hinton v. Burns*, 433 S.W.3d 189, 193–94 (Tex. App.—Dallas 2014, no pet.); *Zeptner v. Zeptner*, 111 S.W.3d 727, 734 (Tex. App.—Fort Worth 2003, no pet.) (op. on reh'g).

*Touponse v. Touponse*, No. 02-20-00285-CV, 2021 WL 2753504, at \*3 (Tex. App.—Fort Worth July 1, 2021, no pet.) (mem. op.).  We have further explained the relationship between a sufficiency review and the abuse-of-discretion standard:

> When determining whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, whether it acted arbitrarily or unreasonably.  The mere fact that we might have decided the issue differently does not establish that the trial court abused its discretion.

Under an abuse[-]of[-]discretion standard, both legal sufficiency and factual sufficiency are relevant factors. Evidentiary sufficiency complaints are not, however, independent grounds of error. Thus, to determine whether a trial court has abused its discretion because the evidence is legally or factually insufficient to support its decision, we must determine (1) whether the trial court had sufficient evidence on which to exercise its discretion and (2) whether the trial court acted reasonably in applying its discretion to those facts.

Anything more than a scintilla of evidence renders the trial court's findings legally sufficient. In contrast, evidence is factually insufficient only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the evidence supporting the finding is so weak or so contrary to the overwhelming weight of all the evidence that the answer should be set aside and a new trial ordered.

When determining whether the trial court abused its discretion, we view the evidence in the light most favorable to its ruling. We must indulge every reasonable presumption that the trial court exercised its discretion properly.

The trial court is in the best position to observe the witnesses and their demeanor. It may choose to believe one witness over another. A factfinder is not compelled to believe uncontradicted testimony that is suspicious or that comes from an interested or biased source. Going one step further, as the factfinder, the trial court may believe or disbelieve even uncontradicted, unimpeached testimony from disinterested witnesses. Of course, the factfinders' credibility decisions must be reasonable.

*Hamilton v. Hamilton*, No. 02-19-00211-CV, 2020 WL 6498528, at *3–4 (Tex. App.—

Fort Worth Nov. 5, 2020, no pet.) (mem. op.) (citations omitted).

Moreover, with regard to findings of fact, a trial court's findings of fact have

the same force and dignity as a jury's answers to jury questions. *Anderson v. City of*

*Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). As with jury findings, a trial court's

fact-findings on disputed issues are not conclusive, and when the appellate record

20

contains a reporter's record, an appellant may challenge those findings for evidentiary sufficiency. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Super Ventures, Inc. v. Chaudhry*, 501 S.W.3d 121, 126 (Tex. App.—Fort Worth 2016, no pet.). We review the sufficiency of the evidence supporting challenged findings using the same standards that we apply to jury findings. *Catalina*, 881 S.W.2d at 297.

## B. The North Carolina Properties

In her second issue, Wendy argues that the trial court erred by awarding the North Carolina properties to Brian. Wendy points to testimony that she and Brian gave at the final trial—during which they proposed splitting the proceeds of the sale of the North Carolina properties—and concludes that they had a binding Rule 11 agreement. Wendy contends that the trial court abused its discretion by awarding the North Carolina properties to Brian instead of following their alleged Rule 11 agreement. The record, however, does not demonstrate that the parties had a binding Rule 11 agreement to split the proceeds from the sale of the North Carolina properties.

### 1. Applicable Law

The Dallas Court of Appeals has succinctly summarized the law on Rule 11 agreements:

> Rule 11 of the Texas Rules of Civil Procedure states, "Unless otherwise provided in these rules, no agreement between attorneys or parties touching any suit pending will be enforced unless it be in writing, signed and filed with the papers as part of the record, or unless it be made in open court and entered of record." *See* Tex. R. Civ. P. 11. A settlement

21

agreement must comply with [R]ule 11 to be enforceable. *Padilla v. LaFrance*, 907 S.W.2d 454, 460 (Tex. 1995) (citing *Kennedy v. Hyde*, 682 S.W.2d 525, 528 (Tex. 1984)); *see also London Mkt. Cos. v. Schattman*, 811 S.W.2d 550, 552 (Tex. 1991) (once existence of agreement concerning pending suit becomes disputed, alleged agreement is unenforceable unless it comports with [R]ule 11 requirements).

*John A. Broderick, Inc. v. Kaye Bassman Int'l Corp.*, 333 S.W.3d 895, 904–05 (Tex. App.—

Dallas 2011, no pet.). When there is no written agreement,

[t]o be "entered of record" includes the dictation of the agreement into the trial court record. Specifically, the requirements for a Rule 11 agreement are satisfied "when the terms of the agreement [are] dictated before a certified shorthand reporter, and the record reflect[s] who [is] present, the terms of the settlement, and the parties' acknowledgement of the settlement."

*Kanan v. Plantation Homeowner's Ass'n*, 407 S.W.3d 320, 328 (Tex. App.—Corpus

Christi–Edinburg 2013, no pet.) (citations omitted).

### 2.    What the Record Shows

Wendy highlights the following from her testimony during the trial:

Q. (BY [WENDY'S ATTORNEY]) Husband's Exhibit 2 lists a 2533 Leonhardt Road property in Cherryville, North Carolina, as separate property. Do you dispute that categorization?

A. Yes.

Q. Do you also dispute the Granite Falls property listing that's on the third and last page of Husband's Exhibit 2?

A. Yes.

Q. Looking at Husband's Summary of Requested Relief, which is Husband's Exhibit 1, let's go back to the Cherryville, North Carolina, and Granite Falls, North Carolina, properties.

Are you *asking* the [c]ourt to order that those properties be sold and that the net sales price be split --

A.  Yes.

Q.  -- between you and Brian Summers?

A.  Yes.  [Emphasis added.]

Wendy's brief also highlights the following from when Brian was questioned about the North Carolina properties by his attorney during the trial:

Q.  Okay.  Now, you and I had a discussion during the last break related to Leonhardt Road and the properties on Leonhardt Road and Grace View Place, did we not?

A.  Yes, we did.

Q.  Has your proposal changed as it relates to those two properties?

A.  No.

Q.  Are you . . . still wanting those to be confirmed as your separate property?

A.  No.  I'm sorry.  I misunderstood the question.  No, they . . . can be joint property.  I'm fine with that.

Q.  Are you *proposing* that those properties be sold and those proceeds split evenly?

A.  Yes.

Q.  Okay.  And do you have any preference as to who sells the property or which party or what real estate agent?

A.  None.  [Emphasis added.]

### 3. Analysis

Here, the record does not contain any written agreement pertaining to the North Carolina properties, nor does Wendy claim that such a written agreement exists. Instead, Wendy points only to the testimony above—that the parties were "asking" or "proposing" that the trial court consider having the North Carolina properties sold and splitting the proceeds between the parties. Although such testimony was made in open court, no agreement was entered on the record. Nor did the parties announce that they had entered into any agreement as to the North Carolina properties.[6] Additionally, the testimony did not nail down any alleged settlement terms, such as who would sell the property. Wendy's and Brian's testimony constituted only a proposed disposition of the North Carolina properties. It did not, however, meet the requirements of Rule 11 to constitute a binding settlement agreement.

---

[6]Wendy argues that this court

> has cited *McLendon* [*v. McLendon*, 847 S.W.2d 601, 608 (Tex. App.—Dallas 1992, writ denied),] with approval for the proposition that "[c]ompliance with the 'open court and entered of record' portion of Rule 11 satisfies the Family Code [S]ection 3.63 requirement of written agreements [in] divorce cases." *Clanin v. Clanin*, 918 S.W.2d 673, 677 [Tex. App.—Fort Worth 1996, no writ).

In *Clanin*, we stated that the record "clearly show[ed] that the parties and attorneys [had] announced in open court [that] they had reached an agreement and that the agreement was dictated into the record in the form of sworn testimony of the parties." 918 S.W.2d at 677. We do not have that scenario here; thus, *Clanin* is distinguishable on its facts.

Because a settlement agreement must comply with Rule 11 to be enforceable and because the parties' testimony that Wendy relies on does not comply with Rule 11's requirements for written or oral agreements, we cannot say that the trial court abused its discretion by failing to enforce a nonexistent Rule 11 agreement and by awarding the North Carolina properties to Brian. *See El Paso Indep. Sch. Dist. v. Alspini*, 315 S.W.3d 144, 151 (Tex. App.—El Paso 2010, no pet.) ("Because this oral agreement was not in writing, signed, and filed with the papers as part of the record, nor was made in open court and entered of record, it does not meet the requirements set forth in Rule 11.").

Additionally, within her second issue, Wendy states that she is challenging findings of fact 13–15, 18, 19, 31, and 32 and conclusions of law 5 and 10. Wendy, however, specifically attacks only conclusion of law 10 in which "[t]he [c]ourt determined [that] the only way to have a just[-]and[-]right division of the community property was to award 2928 Grace View Place, Granite Falls, NC[,] and 2533 Leonhardt Road, Cherryville, NC[, (the North Carolina properties)] to BRIAN MARK SUMMERS." Wendy argues that the trial court's error in failing to order the North Carolina properties to be "sold and the sale proceeds split equally in the [d]ecree, as stipulated by Brian and Wendy" establishes that she was harmed by the property division in the decree. Because there was no enforceable agreement to sell and divide the proceeds of the North Carolina properties and because we have held that the trial court did not abuse its discretion by awarding the North Carolina

25

properties to Brian, we further hold that Wendy was not harmed by this property division in the decree. *See Murff*, 615 S.W.2d at 698 (stating that the trial court has wide discretion in dividing the estate of the parties and that the division should be corrected on appeal only when an abuse of discretion has been shown); *Todd v. Todd*, 173 S.W.3d 126, 128–29 (Tex. App.—Fort Worth 2005, pet. denied) (same).

Accordingly, we overrule Wendy's second issue.

### C. Waste Award of $33,534.43

In her fourth issue, Wendy "addresses any assertion that an award . . . for waste can be sustained in the amount of $33,534.43, the amount set forth in the Findings of Fact and Conclusions of Law."[7] But within the discussion of her fourth issue, she

---

[7]The trial court made the following findings of fact related to the payments that Wendy had not made after she was ordered to pay them in the enforcement order:

23. WENDY MINCER SUMMERS failed to pay Eight Hundred Twenty-Six and 00/100 dollars ($826.00) to BRIAN MARK SUMMERS for his reasonable and necessary expenses, costs[,] and attorney's fees on or before 5:00 p.m. on October 29, 2020[,] as ordered pursuant to the Order Granting Respondent's Motion for Protective Order entered on October 7, 2020, and said amount was still outstanding and due as of the time of trial.

24. WENDY MINCER SUMMERS failed to pay Five Hundred and 00/100 dollars ($500.00) in fines to BRIAN MARK SUMMERS[ ] on or before 5:00 p.m. on October 29, 2020[,] as ordered pursuant to the Order on Motion for Enforcement of Denton County Standing Orders entered on October 7, 2020, and said amount was still outstanding and due as of the time of trial.

25. WENDY MINCER SUMMERS failed to pay Three Thousand Six Hundred Sixty and 50/100 dollars ($3,660.50) to BRIAN

26

narrows her argument to challenge solely the legal and factual sufficiency of the evidence to support finding of fact 26, which relates to the $28,548.43 award that arose as a result of the enforcement hearing. Based on the evidence presented at both the enforcement hearing and the trial, we hold that the evidence is sufficient to support the $28,548.43 award included within the $33,534.43 waste award and that Wendy has not shown that the trial court abused its discretion with regard to that award.

### 1. The Law on Waste and Fraud on the Community

The Fourteenth Court of Appeals has set forth the law on fraud on the community and how waste relates to that concept:

MARK SUMMERS for his reasonable and necessary expenses, costs[,] and attorney's fees on or before 5:00 p.m. on October 29, 2020[,] as ordered pursuant to the Order on Motion for Enforcement of Denton County Standing Orders entered on October 7, 2020, and said amount was still outstanding and due as of the time of trial.

26. WENDY MINCER SUMMERS failed to deposit Twenty-Eight Thousand Five Hundred Forty-Eight and 43/100 dollars ($28,548.43) into the Registry of the Court on or before 5:00 p.m. on October l4, 2020[,] as ordered pursuant to the Order on Motion for Enforcement of Denton County Standing Orders entered on October 7, 2020, and said amount was still outstanding and due as of the time of trial.

27. The value of the reconstituted estate related to WENDY MINCER SUMMERS is $33,534.43.

In conclusion of law 6, the trial court concluded that Wendy had "wasted community assets in the amount of $33,534.43." This amount appears to be the total of the four amounts in findings of fact 23 through 26, but it is off by $0.50.

27

A fiduciary duty exists between a husband and a wife as to the community property controlled by each spouse. The breach of a legal or equitable duty that violates this fiduciary relationship is called a fraud on the community, a judicially[ ]created concept based on the theory of constructive fraud. Fraud on the community, although not actually fraudulent, has all of the consequences and legal effects of actual fraud because it tends to deceive the other spouse or violates confidences that exist as a result of the marriage. Waste is one form of fraud on the community. Waste occurs when a spouse, without the other spouse's knowledge or consent, wrongfully depletes the marital estate of community assets. The Supreme Court of Texas has recognized waste of community assets as a factor a trial court should consider when dividing a community estate.

A presumption of waste arises when one spouse disposes of the other's interest in community property without the other spouse's knowledge or consent. In that circumstance, the burden of proof to show fairness in disposing of the community asset is placed on the disposing spouse. A waste finding can be supported by evidence that a spouse used excessive funds without the other spouse's consent.

*Matter of Marriage of Walzel*, No. 14-16-00637-CV, 2018 WL 614767, at *3 (Tex. App.—Houston [14th Dist.] Jan. 30, 2018, no pet.) (mem. op.) (citations omitted).

### 2. What the Record Shows

As noted above, Wendy admitted at the enforcement hearing that she had withdrawn $28,548.43 from the parties' joint checking account. Also during the enforcement hearing, Brian's attorney questioned Brian about an exhibit showing some large expenditures that Wendy had made using the bulk of the $28,548.43:

Q. And then if you look at Exhibit 12 that's previously been admitted, if you look at the May 26th, 2020, highlight, that was an expenditure by Ms. Summers to pre-pay U.S.A.A. insurance payments for six months; is that correct?

A. That's correct.

28

Q. When you and [Wendy] co-habitated, did . . . y'all ever pre-pay months in advance of insurance premiums?

A. I think we may have done that once in the time of our marriage. Most of the time it would have been month-to-month.

Q. If you turn to Page 3, you'll see on May 12th, 2020, a withdrawal from her checking account in the amount of $22,232. Do you see that?

A. Yes, uh-huh.

Q. And there's a note there that says, lease payment minus deposits and application fees. Do you see that?

A. Yes.

Q. Is it your understanding that [Wendy] pre-paid the entire year of her new rental property with that $22,232?

A. That's my understanding, yes.

Q. . . . [W]hen you and [Wendy] were co-habitating, did either of you ever pre-pay rent for a year in advance?

A. No, never.

Q. How would the two of you normally pay rent, to the extent you were renting, during your marriage?

A. It would have been on a month-to-month basis.

Q. So a pre-payment of rent for a year would be out of the ordinary course for [Wendy]. Would that be fair to say?

A. Yes.

Q. Now, if you turn to Page 6 of that document, . . . on March 5th, 2020, there is an expenditure for health insurance premiums for . . . August 2020. Do you see that?

29

A. Yes.

. . . .

Q. Okay. And that expenditure was in the amount of [$]3,248; is that correct?

A. Yes.

Q. So that expenditure was essentially for six months of health insurance premiums for [Wendy] and her daughter[ from a prior marriage]; is that correct?

A. That's correct.

Q. Now, . . . when you and [Wendy] were co-habitating, . . . how would you normally pay for health insurance premiums?

A. Well, . . . when it was covered in my employment, we would pay it obviously out of the monthly deductions that the employer did. There was a time when I was self-employed where we paid for the insurance ourselves, and it was done on a monthly basis.

Q. So a pre-payment of six months of health insurance premiums would be . . . an abnormal expenditure. Is that fair to say?

A. Yes.

Q. And if you add the [$]774.35 for the U.S.A.A. insurance premiums, the [$]22,232 for the year['s] worth of lease payments and then the [$]3,248 for health insurance premium pre-payments, that amount would come to approximately $26,254. Is that fair?

A. Yes.

Q. And that is approximately the same amount she withdrew in December [when she withdrew] [$]28,548.43; is that correct?

A. Yes, sir, close.

Q. Are you asking the [c]ourt to find that [Wendy] has violated the [s]tanding [o]rders that were attached to the back of her own [p]etition for [d]ivorce for withdrawing the amount of $28,548.43 on December 20th, 2019?

A. Yes.

Q. And you're alleging the violations of the [s]tanding [o]rders as outlined in Respondent's Exhibit 1, the summary of your requested relief; is that correct?

A. That's correct.

Later during the enforcement hearing, Wendy questioned Brian about a note that he had written in which he agreed to provide her with financial support to pursue completing her Ph.D. Brian explained that the note came into being when they were discussing a separation agreement and that the note "was no longer applicable" once Wendy filed for divorce. Brian testified that he had told her that he was not going to continue her "funding."

Wendy testified about what she did with the money that she had withdrawn as follows:

In order to . . . pay for my tuition, my living expenses, my attorney's fees, I used that money. It was in accordance with the specific authorizations that are laid out in the [s]tanding [o]rder.

. . . I don't know, other than they were necessary living expenses. And I had the funds to do it knowing that I would not get continued support, and I chose to do that while I could.

. . . .

31

This is how I spent the money on, um, my utilities and all of the expenses and everything that I had to pay, and so you will see that it was well beyond $28,000.

So I . . . was told he wasn't going to pay for them anymore, and I had a daughter in a private school. She has autism. And I . . . had to pay her tuition.

And so it has, um, the amount of insurance. It shows where I . . . had to pay for mine in January. . . .

. . . .

. . . Okay. So . . . those are showing my fees. That's what I did, um, with the money. . . . [E]verything on there is well within what the stipulations are in the [s]tanding [o]rder that I'm allowed to pay for. It is attorney's fees, reasonable living expenses, work-related stuff. It's my daily living expenses. . . .

THE COURT: Who [are] David and Lilly Wright?

[WENDY]: Those were the landlords at the, um, house we rented in Dallas. I . . . also paid that lease, the remainder, in case I didn't get funds. So I didn't want to be in a position where I would have to be kicked out or anything, so I went ahead and paid the remainder of that lease.

And it . . . may not seem customary to pay these kinds of sums up front, but knowing that I was not going to be getting any funding, I had to make sure that I [had housing.]

. . . .

But I did pay them, and I . . . don't like owing people money. So I paid enough to make sure that I was taken care of, and that's what I did with the money. That's all I have to say.

As noted above in the background section, the trial court found that Wendy had violated the standing order by removing, transferring, withdrawing, and spending

$28,548.43 from the parties' joint checking account for a purpose not authorized by the standing order.

At the final trial, Brian's attorney cross-examined Wendy about the $28,548.43:

Q. (BY [BRIAN'S ATTORNEY]) For [$]28,548.43, on December 20th, do you see a withdrawal?

. . . .

A. Yes.

Q. (BY [BRIAN'S ATTORNEY]) You made that withdrawal, correct?

A. I did.

Q. And you were ordered to deposit that same amount into the registry of the [c]ourt back in October, correct?

A. Yes.

Q. And have you done that?

A. No.

During redirect, Wendy's counsel asked her if she had the funds to pay the amount that she was ordered to deposit into the court registry, and she stated, "No, and I . . . informed the Judge of that."

During Brian's testimony at trial, his attorney asked him about some large expenditures that Wendy had made using the bulk of the $28,548.43, and he gave testimony similar to his testimony at the enforcement hearing:

Q. Now, with those funds, we've highlighted a number of large abnormal expenditures. If you scroll to March of 2020[ on Brian's

33

Exhibit 27], there's an expenditure of pre-payment of health insurance. Do you see that?

. . . .

A. Yes.

Q. Now, that's a pre-payment of health insurance . . . . [D]o you recall [Wendy] ever pre-paying for health insurance . . . while y'all were married?

A. I don't believe so, no.

Q. Okay. If you scroll up to Page 3, you'll see a . . . payment of $22,000 and change. Do you see that?

A. Yes, I do.

Q. And that's a pre-payment for her apartment for a year.

A. . . . I believe it's a house. But, yes, it's for a year.

Q. In the time y'all were married, are you aware of any time [Wendy] has pre-paid rent or mortgage for an extended period of time?

A. No.

Q. If you go to Page 1 towards the bottom, you'll see a payment towards U.S.A.A. Insurance for six months. Do you see that?

A. Yes.

Q. Do you have any understanding as to what that insures?

A. That's her automobile insurance.

Q. Okay. During your marriage, are you aware of any pre-payment towards auto insurance by [Wendy]?

A. Not by [Wendy], no. I sometimes would pre-pay insurance, but I don't believe she ever did.

Q. So these payments by [Wendy] would be abnormal from her normal business routine?

A. Yes.

### 3. Analysis

Wendy's argument on appeal is that the amount that she prepaid for health insurance, rent, and auto insurance "clearly come within 'living expenses of a spouse or a child of a spouse.'" Because the amount that Wendy challenges first appeared in the trial court's order on Brian's motion for enforcement of the standing order, we look to the standing order's guidelines for allowable living expenses. Section 6.3 of the standing order allows parties to make expenditures for reasonable and necessary living expenses but requires that the expenses be "commensurate with such expenditures . . . incurred for the past six months." Brian's testimony at both the enforcement hearing and the final trial demonstrates that it was not customary for the parties to prepay six months' to a year's worth of rent and health and auto insurance; they usually paid on a month-to-month basis. Moreover, Wendy admitted during her testimony at the enforcement hearing that it "may not seem customary to pay these kinds of sums up front." Brian's and Wendy's testimony constitutes more than a scintilla of evidence that she had diverged from the parties' normal practice of paying expenses monthly when she used the bulk of the $28,548.43 withdrawal to prepay expenses that were not "commensurate with such expenditures . . . incurred for the past six months." Wendy's spending went beyond the bounds of the standing order's

35

allowable expenses and supports the trial court's enforcement order, which ordered Wendy to deposit into the court's registry the amount of $28,548.43 because she had removed, transferred, withdrawn, and spent that amount from the parties' joint checking account for a purpose not authorized by the standing order.

Moreover, sufficient evidence supports the trial court's inclusion of that amount in the final decree. Wendy testified at trial that she had not complied with the enforcement order and that the $28,548.43 had not been paid to the court's registry. Because Wendy had already received the benefit of those funds when she used them to prepay expenses and because she admitted that she did not have money to repay them, the trial court did not enter a judgment against her for that amount but instead awarded her that amount as a waste award in the final decree. We conclude that the evidence from both the enforcement hearing and the trial is legally and factually sufficient to support the trial court's finding of fact 26 and the $28,548.43 award to Wendy as that amount is included in the $33,534.43 waste award in the final decree.

Wendy also challenges the conclusion that she "wasted community assets in the amount of $33,534.43." She cites two cases[8] for the general rule that prohibits reimbursement for living expenses and then argues that "[t]o allow non-reimbursable items to be 'recouped' as waste, approve[s] and encourages the side-stepping of

---

[8]*See Jones v. Jones*, No. 02-15-00403-CV, 2017 WL 1738006, at *3 (Tex. App.—Fort Worth May 4, 2017, no pet.) (per curiam) (mem. op.); *McCoy v. McCoy*, No. 02-15-00208-CV, 2016 WL 3659122, at *3 (Tex. App.—Fort Worth July 7, 2016, no pet.) (mem. op.).

[Section] 3.409." *See generally* Tex. Fam. Code Ann. § 3.409 (setting forth nonreimbursable claims, including the living expenses of a spouse or child of a spouse). Here, Wendy's argument ignores that the trial court specifically found that her alleged living expenses were for a purpose not authorized by the standing order, and we have upheld that ruling. Additionally, Wendy's action—withdrawing and spending funds from the parties' joint checking account, without Brian's consent, so that she could prepay expenses beyond her month-to-month living expenses—depleted the marital estate that was available to Brian while the case was pending.

Wendy further argues that there is no evidence of an essential element of waste because "Brian never provided any evidence at the [t]rial that he did not know of or consent to Wendy's expenditures." But Wendy ignores Brian's testimony from the enforcement hearing; he stated that he did not agree to provide for her needs once she filed for divorce. And Wendy testified at the enforcement hearing that she would not receive "continued support," that she knew that she "was not going to be getting any funding," and that she "paid enough to make sure that [she] was taken care of." This also constitutes more than a scintilla of evidence that Brian did not consent to the prepaid expenditures that Wendy made from the $28,548.43.

Because Brian did not consent to Wendy's prepaying her rent for one year and her health and auto insurance for six months, a presumption of waste arose. *See Marriage of Walzel*, 2018 WL 614767, at *3. Wendy did not carry her burden to show fairness in disposing of the community's funds in the parties' joint checking account

37

as the evidence reflected that it was not the parties' common practice to prepay expenses. The trial court's conclusion of law 6 is thus correct regarding the $28,548.43 portion of the $33,534.43 waste award that Wendy challenges on appeal.

Having concluded that the evidence is legally and factually sufficient to support the challenged portion of the $33,534.43 waste award, we hold that the trial court did not abuse its discretion when it awarded that amount to Wendy in the final decree. We therefore overrule Wendy's fourth issue.

### D.    Waste Award of $56,631.50

In her third issue, Wendy argues that the trial court abused its discretion and failed to make a just-and-right division by overvaluing the waste claim that it awarded to Wendy. Wendy contends that the trial court abused its discretion in the decree by awarding her $56,631.50 as the value of the assets that she had wasted because finding of fact 27 and conclusion of law 6 "provide a controlling value of the waste of $33,534.43." By arguing that "the [t]rial [c]ourt abused its discretion in 'awarding' Wendy a phantom $56,631.50," Wendy thus implies that only one amount can be correct and that it is the lesser of the two amounts. Because the record reflects that Wendy admitted to withdrawing from the parties' joint checking account the $56,631.50—separate and apart from her admission that she had not paid the four assessments totaling $33,534.43—we cannot conclude that the trial court abused its discretion by including the $56,631.50 award in the final decree.

### 1. The Law on Additional Findings

"Under Rule 298 of the Texas Rules of Civil Procedure, if a party does not request additional or amended findings, it cannot later attack the lack of such findings, and this remains true even in the context of [a suit for dissolution of a marriage]." *See Hamilton*, 2020 WL 6498528, at *1 (citing Tex. R. Civ. P. 298 and numerous cases); *Villalpando v. Villalpando*, 480 S.W.3d 801, 810 (Tex. App.—Houston [14th Dist.] 2015, no pet.) ("Because [wife] failed to request additional findings of fact and conclusions of law, she has waived her complaint that the trial court erred by failing to make any omitted findings [relating to fraud on the community or her request for the calculation of the reconstituted estate].").

### 2. What the Record Shows

During the final trial, Brian's attorney cross-examined Wendy about various withdrawals, including the $56,631.50:

> Q. (BY [BRIAN'S ATTORNEY]) Now, ma'am, if you scroll down to Page 5 and Page 6[ of Brian's Exhibit 32], you'll see two withdrawals: One in the amount of $11,980.29, and one in the amount of $56,631.50. Do you see that?
>
> . . . .
>
> A. Yes.
>
> Q. Okay. Did you make those withdrawals?
>
> A. No, I did not.
>
> Q. So your testimony here today is that on November 7th, 2019, you did not withdraw $11,980.29 from the joint account.

A. Yes, it is.

*Q. Okay. And it's your testimony here today that on November 22nd, 2019, you did not withdraw $56,631.50 from this account.*

*A. No, that one, I did.* [Emphasis added.]

In the final decree, the trial court reconstituted the community estate with the amount of Wendy's constructive fraud or waste and then awarded that entire amount to Wendy as an illusory asset.

### 3. Analysis

Within her third issue, Wendy notes that "[n]o finding or conclusion addresse[d] [the waste award of] $56,631.50." Wendy, however did not request additional findings when the initial findings omitted any reference to the $56,631.50 waste award. Therefore, she cannot now attack the lack of such finding. *See Villalpando*, 480 S.W.3d at 810.

Moreover, the record is clear that there were two large amounts that Wendy had withdrawn from the parties' joint checking account on two separate dates. As set forth above in the background section, Wendy admitted in her response to Brian's enforcement motion and in her testimony during the enforcement hearing that she had withdrawn $28,548.43 from the parties' joint checking account on December 20, 2019; this amount was included within the $33,534.43 that Wendy was ordered to pay as a result of violating the standing order. Separate from this amount, Wendy admitted in her response to the enforcement motion and in her testimony at the final

40

trial that she had withdrawn $56,631.50 from the parties' joint checking account on November 22, 2019. Wendy has therefore not shown that the trial court overvalued the $56,631.50 waste award. We hold that the evidence is sufficient to support the amount of the waste award and that the trial court did not abuse its discretion by including the $56,631.50 waste award as a separate award in the final decree. Accordingly, we overrule Wendy's third issue.

### E.  Cumulative Error

In her fifth issue, Wendy argues that "[t]he property division in the [d]ecree is not a just[-]and[-]right division due to the identified errors in Issues One through Four, inclusive." Wendy's fifth issue appears to raise a cumulative-error challenge to the final decree. Because we have overruled Wendy's first through fourth issues, Wendy's challenge to the final decree's just-and-right division of the parties' community property fails. We thus overrule Wendy's fifth issue.

## V.  Conclusion

Having overruled Wendy's five issues, we affirm the trial court's final decree of divorce.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered:  May 19, 2022

41